# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SWAYSEY RANKIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 16 C 9534 |
| v. ) | |
| ) | Judge John Z. Lee |
| WEXFORD HEALTH SOURCES, INC., ) | |
| SALEH OBAISI, M.D., WILLIAMS, M.D., ) | |
| DAVIS, M.D., and BAKER, M.D., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Swaysey Rankin, an inmate at Dixon Correctional Center, has brought this lawsuit pursuant to 42 U.S.C. § 1983. Rankin alleges that Defendants Wexford Health Sources, Inc. ("Wexford"), Saleh Obaisi, LaTanya Williams, Ann Davis, and Dr. Baker were deliberately indifferent to his serious medical condition, and that they intentionally inflicted emotional distress upon him. Wexford, Williams, and Davis (hereinafter, "Defendants") have moved for summary judgment.[1] For the reasons stated herein, the motion is granted.

---

[1] Despite this case pending for over two years, Dr. Baker has not been served. Accordingly, the Court dismisses Dr. Baker pursuant to Fed. R. Civ. P. 4(m). Furthermore, a Suggestion of Death as to Dr. Obaisi was filed on March 5, 2018. *See* ECF No. 55. At a status hearing the next day, defense counsel indicated that Dr. Obaisi's wife (the executor of his estate) had agreed to accept service on behalf of the estate via e-mail. *See* ECF No. 56. Yet, the docket does not reflect that the estate has been served. Dr. Obaisi is therefore dismissed pursuant to Fed. R. Civ. P. 25(a).

## Background[2]

The following facts are undisputed except where noted. Rankin, who is currently in the custody of the Illinois Department of Corrections, was housed at Stateville Correctional Center from February 26, 2013 to February 25, 2015. Defs.' LR 56.1 Stmt. ("Defs.' SOF") ¶ 6, ECF No. 78. While there, he attended medical appointments with various providers, including Dr. Davis, a staff physician; Dr. Obaisi, the prison's medical director; and Williams, a physician's assistant. *Id.* ¶¶ 2–4.

Rankin attended a "chronic clinic" appointment (for inmates with chronic conditions such as hypertension, which Rankin has) with Dr. Davis on April 3, 2013. *Id.* ¶¶ 3, 8. Rankin reported that he was feeling well and had no shortness of breath or edema. *Id.* ¶ 9. Dr. Davis concluded that Rankin's cholesterol level was good, his blood pressure was under control, and he should continue managing his hypertension with blood-pressure medication. *Id.* ¶ 11.

Rankin next had a medical appointment on May 23, 2013, when he saw Williams. *Id.* ¶ 12. He complained of a rash on his head and neck and told Williams that he had previously had knee surgery. *Id.* Williams examined Rankin and concluded that his condition was within normal limits and that he was not in any acute distress. *Id.* She prescribed two medications to treat Rankin's rash and inflammation. *Id.* ¶ 13.

---

[2] The Court recognizes that Rankin, who is represented by recruited counsel, has failed to comply with aspects of Local Rule ("LR") 56.1. Under the rule, where a fact set forth by the moving party is disputed, the nonmoving party must reference "affidavits, parts of the record, and other supporting materials relied upon" for the denial. LR 56.1(b)(3)(B). Several of Rankin's responses to Defendants' statements of fact failed to provide such references. *See* Pl.'s Resp. Defs.' LR 56.1 Stmt. ("Pl.'s Resp. Defs.' SOF") ¶¶ 14, 16, 22–23, 29, ECF No. 81.

Additionally, in setting forth his statement of additional facts, Rankin cited to his initial complaint and exhibits. *See* Pl.'s LR 56.1 Stmt. Add'l Facts ("Pl.'s SOAF") ¶¶ 1, 3–7, ECF No. 81. Reliance on the pleadings is insufficient at the summary-judgment stage, *see Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010), and citation to the initial complaint is improper given that Rankin's counsel filed an amended complaint, *see* Am. Compl., ECF No. 19. Nonetheless, even excusing Rankin's failure to comply with Local Rule 56.1, he has failed to establish a genuine issue of fact for trial for the reasons noted.

Rankin had another appointment with Dr. Davis on July 19, 2013. *Id.* ¶ 15. At this appointment, Rankin reported that he had been taking his blood-pressure medication and denied having any chest pain, shortness of breath, or swelling. *Id.* Dr. Davis noted that Rankin's neurological exam was normal, that he had no swelling in his lower extremities, and that his blood chemistries were normal. *Id.* ¶ 17. She renewed his blood-pressure medications. *Id.*

Several days later, on July 24, 2013, Williams prescribed Rankin clindamycin capsules. *Id.* ¶ 19. The prescription was not written at a patient visit, however; Williams did not see Rankin that day. *Id.*, Ex. B ("Williams Dep.") at 20:16–23:1, ECF No. 78-2.

Rankin's next appointment was on November 18, 2013, when he saw Williams for a complaint of bumps on the back of his head, as well as a refill of his blood-pressure medication. Defs.' SOF ¶ 20. Williams examined Rankin and determined that his physical condition was within normal limits and that his heart and lung function was normal. *Id.* She concluded that he had folliculitis. *Id.* She planned for Rankin to have an appointment with the prison's medical director on December 26, 2013, and planned to submit a prescription for a refill of the blood-pressure medication. *Id.* ¶ 21. For Rankin's head, she prescribed two medications, as well as therapeutic shampoo. *Id.*

Shortly thereafter, on November 27, 2013, Rankin had another appointment with Dr. Davis. *Id.* ¶ 23. Rankin reported no chest pain, shortness of breath, or swelling. *Id.* Dr. Davis renewed his blood-pressure medication and prescribed him loratadine (an allergy medication), Motrin, and triamcinolone cream for a rash. *Id.*

Rankin had an appointment with Dr. Obaisi on December 26, 2013. *Id.* ¶ 25. At that time, Rankin complained of left-shoulder pain and knee pain and stated that he had difficulty climbing into the top bunk. *Id.* Dr. Obaisi concluded that Rankin had tendinitis and stiffness in his knee

and shoulder. *Id.* ¶ 26. He planned for Rankin to receive medical permits for a low bunk and a waist chain. *Id.* Dr. Davis renewed these medical permits on January 11, 2014. *Id.* ¶ 27.

Rankin next met with Williams on August 22, 2014, for a complaint of pain in his right knee. *Id.* ¶ 28. He indicated that he had been experiencing knee pain since 2008, and that he had previously had surgery on his right leg. *Id.* According to Rankin, he had worn a knee support while he was at the Cook County Jail. *Id.* He told Williams that taking weight off his right knee caused pain in his left knee, but that he was "good" with ice and Naprosyn for the pain. *Id.* Williams examined Rankin and noted that he was obese, well-developed, well-nourished, and in no acute distress; that his heart and lungs were normal; and that he had decreased range of motion in his right knee, as well as crepitus in his left knee. *Id.* ¶ 30. She assessed that Rankin had right-leg open reduction internal fixation, meaning that his leg had been repaired using hardware such as pins, rods, or screws. *Id.* ¶ 31. She issued Rankin a permit for ice, twice per day, for one month, and planned to order him a knee support. *Id.* ¶ 32.

Rankin saw Dr. Obaisi on October 6, 2014, complaining of a swollen lip. *Id.* ¶ 33. Dr. Obaisi prescribed several medications for Rankin's lip. *Id.* When Rankin saw Dr. Obaisi again, approximately one month later, the issue with his lip had resolved. *Id.* ¶ 34.

Rankin was transferred to Western Illinois Correctional Center on February 25, 2015. *Id.* ¶ 35. After arriving there, he complained to the medical director, Dr. Baker, that he was having trouble breathing. *Id.* ¶ 36. Dr. Baker ordered a sleep study for Rankin. *Id.* After undergoing the sleep study, Rankin was diagnosed with sleep apnea and was issued a CPAP machine, which alleviated his symptoms to a degree. *Id.* ¶¶ 37–38; Pl.'s Resp. Defs.' SOF ¶ 38; Pl.'s SOAF ¶ 9.

It is disputed whether, during Rankin's medical appointments with Dr. Davis and Williams at Stateville, Rankin told them that he had been experiencing any problems with his sleep.

4

Rankin's medical records do not contain any mention of breathing problems during sleep. Defs.' SOF ¶ 47. Nonetheless, Rankin testified that he had informed Dr. Davis during his April 3, 2013, appointment "about [his] head and everything [he] was getting woke up out of [his] sleep." *Id.*, Ex. A ("Rankin Dep.") at 63:1–4, ECF No. 78-1. By contrast, Dr. Davis testified that, had Rankin complained of such symptoms, she would have noted it in his chart. Defs.' SOF, Ex. C ("Davis Dep.") at 26:14–28:1, ECF No. 78-3.

Rankin also relies on two grievances attached to his initial complaint to demonstrate that he had alerted the medical staff about his sleep-related symptoms. In one grievance dated December 27, 2014, Rankin stated that he "constantly complained" to Dr. Davis, Dr. Obaisi, and Williams "that [he] [has] some type of sleep [dis]order of some sort that's very serious." Compl., Ex. C, ECF No. 1. In a second grievance dated February 22, 2015, Rankin stated that he told Dr. Davis, Williams, and Dr. Obaisi about his "medical issue," meaning his loud snoring, disrupted breathing during sleep, and headaches, and that he "asked them for a sleep study." *Id.* Dr. Davis and Williams stated at their depositions that, had Rankin complained to them of any such symptoms, they would have noted it in his medical records. Defs.' SOF ¶¶ 14, 22–23, 29; Davis Dep. at 35:16–23; Williams Dep. at 20:2–15.

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight,*

*Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

### I. Statute of Limitations

Defendants first argue that Rankin's deliberate-indifference claim is barred by the statute of limitations. Section 1983 claims are governed by the forum state's personal-injury statute of limitations. *Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001) (citation omitted). In Illinois, the applicable statute of limitations is two years. *Id.* In general, a § 1983 claim accrues when "the plaintiff knew or should have known that his constitutional rights had been violated." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006) (citation omitted).

Defendants contend that Rankin's claims against Dr. Davis and Williams accrued on the dates of his last medical appointments with them, which occurred in January 2014 and August 2014, respectively. *See* Defs.' SOF ¶¶ 27, 32. This lawsuit was filed more than two years later, in October 2016; thus, Defendants argue, the claims are untimely. But in cases like this involving an ongoing denial of medical treatment, the accrual date for a deliberate-indifference claim may be delayed "for as long as the defendant[] had the power to do something about [the plaintiff's] condition." *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). Accordingly, the statute of limitations for such a claim begins to run when either the plaintiff or the defendant leaves the prison; at that time, the defendant loses the "power to do something" about the plaintiff's treatment. *Id.; see also Jones v. Feinerman*, No. 09 C 03916, 2011 WL 4501405, at *4 (N.D. Ill. Sept. 28,

6

2011) (concluding that plaintiff's claims accrued when he was transferred to another facility, out of the defendant's care).

Here, it is undisputed that Williams has been continuously employed at Stateville since 2002, *see* Williams Dep. at 8:23–10:4, while Rankin was transferred out of Stateville to Western Illinois Correctional Center on February 25, 2015. Defs.' SOF ¶ 6. Accordingly, Rankin's claim against Williams accrued on the date of transfer, and because this lawsuit was brought less than two years after that date, Rankin's claims against Williams are timely.

On the other hand, Dr. Davis left Stateville in August 2014. Defs.' SOF ¶ 3. At that point, she no longer had the power to do anything concerning Rankin's medical treatment. Rankin did not initiate this lawsuit until October 2016—more than two years after Dr. Davis's departure from Stateville. Thus, as to Dr. Davis, Rankin's claims are untimely, and Defendants' motion for summary judgment is granted as to Dr. Davis.

## II. Liability of Wexford

A plaintiff can sustain a § 1983 claim against an institutional defendant like Wexford only if he can show that the entity has a policy or custom that sanctions the violation of his rights. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). A plaintiff must demonstrate this liability in one of several ways. First, he can identify an explicit policy that has caused the constitutional violation. *See, e.g.*, *Pindak v. Dart*, 125 F. Supp. 3d 720, 756 (N.D. Ill. 2015). Second, he can demonstrate a "widespread practice" by showing a series of bad acts and inviting the Court to infer the existence of policymaking that rises to the level of culpability. *Id.* (citing *Hahn v. Walsh*, 762 F.3d 617, 636 (7th Cir. 2014)). Third, he can allege that an individual with policymaking authority committed the constitutional violation. *Id.* (citing *King v. Kramer*, 763

F.3d 635, 649 (7th Cir. 2014)). Finally, he can allege that the entity's failure to train led to the deliberate indifference of untrained employees. *See id.* (citations omitted).

Rankin has not identified any policy or practice to which he objects, or that permitted the violation of his rights that he alleges occurred here. *See* Defs.' SOF ¶ 45; Pl.'s Resp. Defs.' SOF ¶ 45. Furthermore, he has failed to set forth facts that support the existence of such a policy or practice. He has not adduced evidence of a "widespread practice," or any evidence that any of the named defendants in this case were in a position of policymaking authority. Finally, Rankin has failed to set forth any facts showing that Wexford's failure to train caused his injuries. What is more, in his response in opposition to Defendants' motion for summary judgment, Rankin failed to address the arguments raised with respect to Wexford's liability under the *Monell* standard. As such, Rankin has waived any argument in response. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Defendants' motion for summary judgment is therefore granted as to Wexford.

### III. Deliberate Indifference

The Eighth Amendment proscribes "deliberate indifference to [the] serious medical needs of prisoners" that is "manifested by prison doctors in their response to the prisoner's needs[.]" *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (citation and footnotes omitted). To prove a claim of deliberate indifference to a serious medical need, a plaintiff must demonstrate (1) that he had an objectively serious medical need; (2) that the defendant was subjectively aware of the inmate's serious medical need; and (3) that the defendant consciously disregarded the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

8

### A. Objectively Serious Medical Need

Defendants first argue that Rankin has failed to demonstrate that he had an objectively serious medical need. An objectively serious medical need is a condition that "has been diagnosed by a physician as mandating treatment," or that is so obvious that a layperson would recognize the need for medical attention. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Here, Rankin testified that beginning in March 2013, he experienced symptoms including "excruciating headaches" and "not [being] able to breathe" during sleep. Rankin Dep. at 78:6–79:10. Furthermore, it is undisputed that in April 2016—after leaving Stateville—Rankin was diagnosed with sleep apnea that required the use of a CPAP machine. Pl.'s SOAF ¶ 9. Plaintiff has met his burden of showing, for purposes of summary judgment, that he was suffering from a serious medical condition. *See, e.g.*, *Smith v. Randle*, No. 10 C 5167, 2014 WL 3558448, at *5 (N.D. Ill. July 18, 2014) (recognizing sleep apnea as an objectively serious medical need); *Dortch v. Davis*, No. 11-cv-0841-MJR-SCW, 2014 WL 1125588, at *5 (S.D. Ill. Mar. 21, 2014) (same); *see also Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 423 (7th Cir. 2017) (noting that "sleep apnea can result in death").

### B. Subjective Awareness

Defendants next contend that there is no evidence that Williams was subjectively aware of Rankin's sleep apnea. Defendants rely on Rankin's medical records, *see generally* Defs.' SOF, Ex. D ("MR"), ECF No. 78-4, which contain no mention of sleep apnea or any indication that Rankin complained to Williams about any sleep-related symptoms. On the other hand, Rankin points to the two grievances attached to his initial complaint. *See* Compl., Ex. C.

The first grievance, dated December 27, 2014, states that Rankin "constantly complained" to PA Williams and several doctors "that [he] [had] some type of sleep [dis]order of some sort

that's very serious." *Id.* at 15. The grievance states that Rankin's cellmates told him that he snored and stopped breathing in his sleep. *Id.* It further states that Rankin told Williams and several doctors that he would "wake up and [not] be able to go back to sleep at night" and that he would "almost always wake up with [excruciating] headaches like migraines of some sort." *Id.* at 16. Furthermore, the grievance indicates that Rankin "complained of this problem every time he saw" Williams or the other medical staff, and that he "asked for them to conduct a sleep study[.]" *Id.* In the second grievance, dated February 22, 2015, Rankin stated that he received no response to his previous grievance, reiterated his symptoms, and stated that he told Williams, as well as several doctors, about his "medical issue." *Id.* at 18.

Although the statements in Rankin's grievances are not particularly specific, a reasonable jury could conclude from them that Rankin told Williams that he was experiencing headaches and trouble breathing while sleeping, and therefore that Williams was subjectively aware of his serious medical need. Rankin's medical records establish that he met with Williams on several occasions while he was incarcerated at Stateville. And while Williams testified that she would have written down any complaints about the symptoms Rankin says he experienced, a jury could reasonably credit Rankin's statements that he told her about those symptoms instead.

Defendants object to the consideration of the statements in Rankin's grievances because as hearsay. They also characterize the grievances as "self-serving (and possibly forged)," "back-dated," and "doctored." Defs.' Reply Supp. Mot. Summ. J. at 10, 13, ECF No. 82. But at the summary-judgment stage, a court may consider *any* evidence that would be admissible at trial; it need not be admissible in form, but it must be admissible in content. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). For example, "affidavits may be considered if

10

the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." *Id.* (citing *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994)).

Here, while Rankin's grievances are hearsay, the statements contained therein are matters within his own personal knowledge, to which he can testify at trial. Rankin was questioned about the grievances during his deposition, and he testified that he wrote them on the dates specified. Rankin Dep. at 79:11–87:8. Thus, even if the grievances would not be admissible at trial (and, indeed, are not attached to the operative complaint in this matter), Rankin's testimony concerning the statements contained therein—*i.e.*, that he told Williams on several occasions about his sleep-related symptoms—*would* be admissible. And a reasonable jury could find, based on that testimony, that Williams was subjectively aware of Rankin's serious medical need.

### C. Conscious Disregard

But even assuming Williams was aware of Rankin's medical need, Rankin has failed to establish that she consciously disregarded it. "[A]n inmate claiming a violation of the Eighth Amendment must do more than show negligence, medical malpractice, or disagreement with a prescribed course of treatment," *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016), and "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances," *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quotation marks and citation omitted). Accordingly, "[a] medical professional acting in [her] professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 895 (quotation marks and citation omitted).

Here, even accepting the statements in Rankin's grievances as true and assuming that he would testify to those statements, no reasonable jury could conclude that Williams consciously disregarded his serious medical need. The grievances indicate that when Rankin saw Williams, she told him that a sleep study was not available at the prison, and that only Dr. Obaisi (the medical director) could "send [him] out for one." Compl., Ex. C., at 16. Furthermore, Williams told Rankin that he "need[ed] to lose weight." *Id.* These statements do not establish that Williams was deliberately indifferent. First, Rankin has provided no evidence that Williams had the ability to order a sleep study, or that a sleep study was available at the prison. And even if he had, the "decision to forego diagnostic tests is a classic example of a matter for medical judgment." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quotation marks and citation omitted); *see also Kelley v. Hardy*, No. 14 C 1936, 2016 WL 3752970, at *5 (N.D. Ill. July 14, 2016) (concluding that a prison doctor's failure to order diagnostic tests for an inmate's rapid heartbeat was not deliberate indifference). Even accepting Rankin's version of events as true, Williams did not ignore his symptoms; rather, she opined that they could be alleviated by weight loss. Rankin has failed to establish that "no minimally competent professional" would have given such a response. *Sain*, 512 F.3d at 894–95.

Additionally, Williams informed Rankin of the person who *did* have the authority to order a sleep study—Dr. Obaisi. It is undisputed that Rankin met with Dr. Obaisi on several occasions while he was at Stateville. And while Rankin alleges that Dr. Obaisi refused to order the sleep study, that has no bearing on whether *Williams's* actions were a "substantial departure from accepted professional judgment, practice, or standards." *Id.* at 895.[3] Accordingly, Rankin has

---

[3] As noted, there is no indication in the record that Rankin served Dr. Obaisi's estate with a summons in this case, despite being informed of Dr. Obaisi's death and that the executor of his estate had agreed to accept service via email.

failed to establish a genuine issue of fact for trial concerning Williams's response to his complaints of sleep-related symptoms.

## IV. Intentional Infliction of Emotional Distress

Rankin's amended complaint also includes a state-law claim for intentional infliction of emotional distress ("IIED"). Defendants argue that they are entitled to summary judgment on this claim because Rankin has failed to establish any of the required elements of an IIED claim. In response to Defendants' motion for summary judgment, Rankin failed to meaningfully respond to this argument. As such, he has waived argument on this issue. *Bonte*, 624 F.3d at 466. Defendants' motion for summary judgment is granted as to Rankin's IIED claim.

## Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is granted. Furthermore, Dr. Baker and Dr. Obaisi are dismissed without prejudice pursuant to Federal Rules of Civil Procedure 4(m) and 25(a). This case is closed.

**IT IS SO ORDERED.**           ENTERED  8/5/19

_____
**John Z. Lee**
**United States District Judge**